**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| MAD DOGG ATHLETICS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-00382-JRG |
| | ) | |
| PELOTON INTERACTIVE, INC. | ) | ███████████ |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |


**PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY OF**
**DEFENDANT'S DAMAGES EXPERT, STEPHEN L. BECKER**

## <u>TABLE OF CONTENTS</u>

I.   Introduction ................................................................................................................ 1

II.   Factual Background ..................................................................................................... 3

    A.   The Patents-in-Suit and the Accused Products ......................................................... 3

    B.   Dr. Becker's Opinions About Reasonable Royalties ............................................... 3

III.   Legal Standard ............................................................................................................ 6

IV.   Argument ..................................................................................................................... 7

    A.   Dr. Becker's Opinion That a ████████████ Is a Reasonable
    Royalty Uses Inapposite Inputs and Fails to Make the Necessary
    Adjustments ............................................................................................................... 7

    B.   Dr. Becker's Opinion Regarding The ████████████ Fails to
    Account for the Absence of Assumption of Validity and Infringement and
    Differences in Peloton's Financial Position ......................................................... 14

V.   Conclusion ................................................................................................................ 15

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                 **Page(s)**

*Alpex Computer Corp. v. Nintendo Co.*,
  No. 86 CIV. 1749 (KMW), 1994 WL 681752 (S.D.N.Y. Dec. 5, 1994), *aff'd in part,*
  *rev'd in part*, 102 F.3d 1214 (Fed. Cir. 1996) ................................................................... 10

*Aqua Shield v. Inter Pool Cover Team*,
  774 F.3d 766 (Fed. Cir. 2014) ........................................................................................... 7

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ........................................................................................................ 3, 6

*Egenera, Inc. v. Cisco Sys., Inc.*,
  No. CV 16-11613-RGS, 2021 WL 2582406 (D. Mass. June 23, 2021) ............................. 10

*Eidos Display, LLC v. Chi Mei Innolux Corp.*,
  No. 6:11-CV-00201-JRG, 2017 WL 1322550 (E.D. Tex. Apr. 6, 2017) ..................... 11, 12

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) .......................................................................................... 6

*Flexuspine, Inc. v. Globus Med., Inc.*,
  2016 WL 9276023 (E.D. Tex. July 6, 2016) ........................................................... 1, 14, 15

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
  331 F.3d 860 (Fed. Cir. 2003) ......................................................................................... 11

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) .............................................................................................. 9

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .................................................................................... 7, 14

*Odetics, Inc. v. Storage Tech. Corp.*,
  185 F.3d 1259 (Fed. Cir. 1999) .................................................................................... 12, 13

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
  849 F.3d 1360 (Fed. Cir. 2017) ....................................................................................... 7, 8

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ........................................................................................... 6

*Spectralytics, Inc. v. Cordis Corp.*,
  649 F.3d 1336 (Fed. Cir. 2011) ..................................................................................... 8, 10

*Spreadsheet Automation Corp. v. Microsoft Corp.*,
  587 F. Supp. 2d 794 (E.D. Tex. 2007) ............................................................................. 14

*SSL Servs., LLC v. Citrix Sys., Inc.*,
 940 F. Supp. 2d 480 (E.D. Tex. Apr. 16, 2013) .................................................................. 10

*State Indus., Inc. v. Mor–Flo Indus., Inc.*,
 883 F.2d 1573 (Fed. Cir. 1989) ........................................................................................ 11

*Syneron Med. Ltd. v. Invasix, Inc.*,
 No. 816CV00143DOCKES, 2018 WL 4696969 (C.D. Cal. Aug. 27, 2018) ...................................... 13

*VirnetX, Inc. v. Cisco Sys.*,
 767 F.3d 1308 (Fed. Cir. 2014) .......................................................................................... 6

**Other Authorities**

Fed. R. Evid. 702 ................................................................................................................ 3, 6

## I.       INTRODUCTION

Defendant Peloton Interactive, Inc. ("Peloton") has designated Dr. Stephen L. Becker as its damages expert witness. Courts—including this Court—have excluded Dr. Becker's expert opinions on at least five occasions. In *Flexuspine, Inc. v. Globus Med., Inc.*, for example, this Court struck Dr. Becker's testimony because his opinion was not based on "sufficiently comparable circumstances to a hypothetical negotiation." No. 6:15-cv-201-JRG-KNM, 2016 WL 9276023, at *5 (E.D. Tex. July 6, 2016). Here, Dr. Becker seeks to offer opinions that are unreliable for substantially the same reason. Specifically, he opines that reasonable royalties under the hypothetical negotiation would be a ███████████████████████ ██████████. Romain Decl. Ex. 1 (Expert Report of Stephen L. Becker, Ph.D. ("Becker Rpt.")) ¶¶ 17, 218, 296, 298. For each of these two opinions, Dr. Becker first relies on evidence that does not reflect economic circumstances similar to the hypothetical negotiation and then fails to make any adjustment whatsoever to account for the differing circumstances.

With respect to his opinion regarding a ████████████ Dr. Becker relies on three inputs: (i) a valuation of Mad Dogg's equity using a fair market standard performed when the Patents-in-Suit did not exist (six years before the hypothetical negotiation); (ii) a valuation of Mad Dogg's invested capital using a fair market standard filed in Mad Dogg's bankruptcy proceeding (*i.e.*, three years after the hypothetical negotiation); and (iii) a filing from Mad Dogg's bankruptcy proceeding regarding Mad Dogg's value using a forced liquidation premise of value, assuming a forced sale of assets under bankruptcy law. But none of these sources is based on the critical assumptions that underlie the hypothetical negotiation—*i.e.*, that the Patents-in-Suit are valid and have been infringed. Nevertheless, Dr. Becker makes ***no adjustment*** to account for these differences and provides no explanation or justification for his failure. Inexplicably, he also neglects to consider the relative bargaining positions of Mad Dogg and Peloton on the date of the

hypothetical negotiation as compared to their relative positions six years earlier and three years later. Dr. Becker makes **no adjustment** for the material changes in the parties' relative bargaining positions and provides no justification for that failure.



Dr. Becker's second ███████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ But his reliance on this settlement is unreliable. First, the facts of the ███████████ Settlement are not consistent with the assumptions about validity and infringement that underlie the hypothetical negotiation. Instead, the settlement resolved a patent infringement lawsuit that ███████████████████ where, prior to settling, Peloton denied that the patents at issue were valid and that Peloton had infringed the patents. When ██████████████ settled the lawsuit, the issues of validity and infringement remained in dispute. In contrast, the hypothetical negotiation assumes validity and infringement. But Dr. Becker makes **no adjustment** to account for these critical differences and offers no explanation or justification for his failure.

Second, Peloton's financial condition during the negotiation of the ██████████ Settlement changed dramatically by the time of the hypothetical negotiation. After the settlement with ██████ (and before the hypothetical negotiation), Peloton obtained **$325 million in financing**—more than double the total financing the company had previously received. This infusion of capital enabled Peloton to expand and strengthen its bargaining position leading up to the hypothetical negotiation. Nevertheless, Dr. Becker relies wholeheartedly on the ██████████ Settlement and makes no adjustment to account for this significant difference.

Dr. Becker's opinions that a reasonable royalty is ████████████████████ ████████████████████████ rely on sources that are materially different (in both time and

substance) from the hypothetical negotiation. He does so without adjustment or any explanation for his failures to adjust, and so the jury cannot rely upon his opinions. This Court should exclude these opinions pursuant to Federal Rule of Evidence 702 and *Daubert*.

## II.  FACTUAL BACKGROUND

### A.  The Patents-in-Suit and the Accused Products

Mad Dogg is the assignee of U.S. Patent Nos. 9,694,240 and 10,137,328 (the "Patents-in-Suit"), which relate to the field of programmable exercise bicycles. Mad Dogg's patented technology covers core features of a stationary exercise bike designed to simulate an instructor-led class in the rider's home. Claims 1, 4-10, and 12-14 of the '240 patent and claims 1, 3, and 4 of the '328 patent directly read on Peloton's products, the Peloton Bike and Peloton Bike+. The earlier of these patents was issued on July 4, 2017, which both parties agree is the date of the hypothetical negotiation. Romain Decl. Ex. 1 ¶¶ 292.

Peloton is a fitness company founded in 2012 to exploit the indoor cycling market that Mad Dogg created, and has subsequently become the largest interactive fitness platform in the world. Peloton has manufactured and sold the infringing products, the Peloton Bike and Peloton Bike+, since 2014 and 2020, respectively.

### B.  Dr. Becker's Opinions About Reasonable Royalties

#### 1.  Dr. Becker's Opinion Regarding Valuations Relating to Mad Dogg

Dr. Becker opines that the July 2017 hypothetical negotiation would result in a lump sum royalty of approximately █████████. Romain Decl. Ex. 1 ¶¶ 214, 216. To calculate this figure, Dr. Becker relied primarily on three inputs: (i) a valuation of equity shares of Mad Dogg using a fair market value standard as of May 31, 2011 that ████████████████████████████ ██████████████████████ ii) an expert report filed by M. Mark Sarchet on April 30, 2020, in connection with Mad Dogg's bankruptcy proceeding, valuing Mad Dogg using a fair market

3

value standard as of December 31, 2020 (the "Sarchet Opinion"); and (iii) a Liquidation Analysis regarding Mad Dogg's value as of December 31, 2020, using a liquidation premise of value which was a supporting exhibit to Mad Dogg's disclosures in its bankruptcy proceeding (the "Chapter 11 Liquidation Analysis"). Romain Decl. Ex. 1 ¶¶ 28, 43, 186, 210, 214.

████████████████████ was conducted *six years before the hypothetical negotiation* and before the Patents-in-Suit existed. The Sarchet Opinion and Chapter 11 Liquidation Analysis were conducted in the context of a bankruptcy proceeding, *three years after the hypothetical negotiation*. Dr. Becker uses inputs from these valuations without adjustment in the calculations supporting his conclusion that ████████████████████████████████ ████████████████████████████ Romain Decl. Ex. 1 ¶ 214 (referring to calculations "shown in Ex. SLB-2A").[1]

2.    **Dr. Becker's Opinion Regarding The** ████████ **Settlement**

Dr. Becker opines that the ██████████████████████████ "is highly comparable to the hypothetical negotiation between Mad Dogg and Peloton in July 2017." Romain Decl. Ex. 1 ¶ 194. But this settlement agreement does not cover the Patents-in-Suit. In the lawsuit

---

[1] There are two components to Dr. Becker's calculation of the ████████████████. First, Dr. Becker calculates the "[d]ifference between" values for "Intangibles & Goodwill" from a balance sheet included in the Sarchet Opinion and values based on estimated recoveries from the Chapter 11 Liquidation Analysis, and describes the resulting amount of $1,487,058 as the "Fair Market Value premium of Intangibles & Goodwill over Net Book Value as of 3/31/2020 implied by Sarchet Report." Romain Decl. Ex. 1 at Ex. SLB-2A at 1, n.7; *id.* Ex. SLB-2B at 1, n.(a), n.(b). The second component is what Dr. Becker characterizes as an "Estimate Net Book Value of Patents as of 3/2020." *Id.* Ex. SLB-2A. To derive that value, Dr. Becker calculates a "Share of Net Book Value from Patents" by dividing the value of ██████████████████████ ████████████████████████████████████████ resulting in 18.1%. *Id.* Dr. Becker then calculates 18.1% of the value of trademarks and patents reported in a balance sheet included in the Sarchet Opinion, and he labels the result of $346,643 as the "Estimate[d] Net Book Value of Patents as of 3/2020." *Id.* In his final step, Dr. Becker ████████████████████████ ████████████████ *Id.*

between █████████████████████████████████████████████████

███████████████████████████████████████████████████ In

its answer, Peloton denied the allegations and asserted counterclaims, seeking a declaratory

judgment that "Peloton ha[d] not infringed any claim of any of the asserted patents" and that each

of the asserted patents "[was] invalid." Answer to Pl.'s First Am. Compl. and Countercl., ECF No.

17.

When the lawsuit settled on ████████████ the Court had not decided the construction of

any claims (or even received briefing on that matter) and discovery was hardly underway.[2] ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ Romain Decl. Ex. 5 ████████████████████ Accordingly, the

litigation had not advanced enough as of the settlement date for any real certainty as to the value

of the patents disputed in that litigation, let alone for informing the values of the Patents-in-Suit.

In opining that the ███████████████████████████████████

████████████ Dr. Becker begins by relying on the expert opinion of Mr. Robert Lee Rawls

(Peloton's patent infringement expert) that the patents at issue in the ████████████ Settlement are

comparable to the Patents-in-Suit. Romain Decl. Ex. 1 ❡ 194. Dr. Becker then provides a cursory

comparison of the circumstances of the ████████████ Settlement and of the hypothetical

---

[2] *See* Order, ECF No. 57 (extending all deadlines relating to claim construction to dates after May
22, 2017); *see also* Order, ECF No. 48 ❡ 7 (reflecting that the deadline for fact discovery was sixty
days after the Court's claim construction ruling).

negotiation. His comparison focuses on three points: (i) the effective date of the ██████

Settlement was ████████████████████ the hypothetical negotiation; (ii) the respective

parties are similarly situated because ██████████████████████ and ████████

██████████████████████ and (iii) the life of each respective license

was similar (both approximately 7.5 years), and so no further adjustment was necessary. Romain

Decl. Ex. 1 ¶¶ 194-198, 226. Based on only the foregoing, Dr. Becker concludes that the amount

paid in the ████████████████████████████████████████

████████████████████████ Romain Decl. Ex. 1 ¶¶ 194, 218. Dr.

Becker provides no justification for his failure to adjust that amount given the uncertainties

inherent in litigation as compared to the assumptions that underlie the hypothetical negotiation.

## III.   LEGAL STANDARD

An expert must apply reliable principles and methods to the facts of the case, and district

courts must exclude expert testimony that is not the result of such reliable principles and methods.

Fed. R Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). In the context

of experts offering opinions regarding reasonable royalty damages in a patent suit, reliable

principles and methods require that the expert's analysis rely on real world inputs (*e.g.*, prior

licenses, settlements) with sufficiently comparable circumstances to the hypothetical negotiation,

or otherwise account for differences when estimating reasonable royalty damages. *See, e.g.*,

*Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010) (reliance on past

licenses requires accounting "for differences in the technologies and economic circumstances of

the contracting parties"); *see also VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014);

*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 873 (Fed. Cir. 2010) (dismissing an expert's

reliance on licenses "without any factual findings that accounted for the technological and

economic differences between those licenses" and the patent-in-suit). In particular, an expert must adjust where the circumstances of a real-world input did not involve the presumption of validity and infringement that underlie the hypothetical negotiation. *See, e.g., Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1371 (Fed. Cir. 2017) ("possible non-liability is a factor that tends to make settlements too low" relative to a hypothetical negotiation).

## IV.   ARGUMENT

### A.   Dr. Becker's Opinion That a ███████████ Is a Reasonable Royalty Uses Inapposite Inputs and Fails to Make the Necessary Adjustments

Dr. Becker's opinion that the hypothetical negotiation would result in a ███████████ ███ royalty makes no adjustments to the valuations on which it relies. Without modification, the valuations on which Dr. Becker relies are not comparable to the hypothetical negotiation, for at least three reasons: (i) they do not assume validity and infringement; (ii) they serve different purposes and use different methods than the hypothetical negotiation; and (iii) they involved materially different factual circumstances. Dr. Becker's approach ignores the material differences in the assumptions, methods, purposes, and factual circumstances that underlie those valuations as compared to the hypothetical negotiation. For these reasons, Dr. Becker's opinion is not reliable, and the Court should exclude it.

### 1.   The Valuations on Which Dr. Becker Relies Do Not Assume Validity and Infringement and Are Not Comparable to the Hypothetical Negotiation

Validity and infringement must be assumed in a hypothetical negotiation. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009); *see also Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771 (Fed. Cir. 2014). The valuations that underlie Dr. Becker's opinions, however, made no assumptions about validity and infringement. In fact, at the time of each of these valuations, Mad Dogg's management was aware that it would need to incur

7

significant legal expenses to assert the validity of its patents and to prove infringement. *See* Romain

Decl. Ex. 2 ██████████████████ ) at 20 (noting "██████████████████████

████████████████████████████████████████████████████████████████

Romain Decl. Ex. 3 (Sarchet Opinion) ⫟ 183 ("[a]ctively enforcing the patents . . . would be

expensive"). Moreover, the ████████████████ was rendered in 2011 before the Patents-in-

Suit even issued.

These valuations cannot reasonably inform the hypothetical negotiation without

adjustment for the fact that hypothetical negotiations assume validity and infringement. When

comparing the value of a patent that assumes validity and infringement with the value of a patent

where no such assumptions are made, the latter is lower because it must account for the financial

resources and time required to assert validity and prove infringement. *See Prism Techs.*, 849 F.3d

at 1371 (explaining, in the context of settlement licenses, that "possible non-liability is a factor

that tends to make settlements too low"); *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1347

(Fed. Cir. 2011) (finding that an earlier valuation of a patent reflected a "very deep discount"

because while the patentee "hoped that the patent would survive any challenge to its validity . . .

it could not really know for certain without paying millions of dollars in legal fees to launch

lengthy and risky litigation.") (internal quotations omitted). Also, patents that have not been tested

in court face legal uncertainties about whether they are valid and whether they have been infringed,

and that uncertainty could significantly depress their value.

The ██████████████ explicitly notes Mad Dogg's ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████ Decl. Ex. 2 at 20. Similarly, the Sarchet Opinion and Chapter Liquidation

Analysis account for challenges in asserting validity and proving infringement. *See* Romain Decl. Ex. 3 ¶¶ 181, 183 (noting that the prospect of Mad Dogg "[a]ctively enforcing [its] patents . . . would be expensive . . ."); *see also id.* at 44-46 (no assumptions that there is no uncertainty regarding patent enforcement); Romain Decl. Ex. 4 (Ch. 11 Liquidation Analysis) at 5-6 (same).

Unlike the valuations on which Dr. Becker relies, the hypothetical negotiation assumes that the real-world challenges of enforcing patents have been resolved in favor of validity and infringement. Therefore, to the extent that these valuations could inform the hypothetical negotiation, there must be some upward adjustment. One appropriate way to account for valuations that do not assume validity and infringement is to adjust upward such valuations; another is to discard such valuation evidence as unreliable. Because Dr. Becker made no upward adjustment, this valuation evidence should be excluded.

**2.      The Valuations on Which Dr. Becker Relies Serve Different Purposes and Utilize Different Methods Than Those in the Hypothetical Negotiation**

The purpose of a hypothetical negotiation is to determine a reasonable royalty by assessing what a willing licensee would agree to pay a willing licensor, assuming validity and infringement. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012). The valuations on which Dr. Becker relies, in contrast, serve different purposes (*i.e.*, not the determination of a reasonable royalty rate) using different methods (*i.e.*, not a voluntary agreement between willing licensor and licensee). Notwithstanding these material differences, Dr. Becker relies on these valuations without adjustment.

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████. Romain Decl.

Ex. 2 at 3. Dr. Becker describes the Sarchet Opinion as an opinion on "the Total Invested Capital" of Mad Dogg as of December 31, 2020. Romain Decl. Ex. 1 ⁋ 43. This valuation, too, is premised on a fair market value standard. Romain Decl. Ex. 3 at ⁋ 85. Finally, the Chapter 11 Liquidation Analysis was prepared to assess Mad Dogg's liquidation value as of December 31, 2020, under applicable bankruptcy law.

These valuations are not comparable. The value of the patents could not be reasonably determined by applying a fair market value standard because that appraisal might—and here, does—significantly undervalue the patents as compared to using a valuation standard compliant with 35 U.S.C. § 284. This is a critical point that Dr. Becker has already admitted (albeit not in this report). *See Egenera, Inc. v. Cisco Sys., Inc.*, No. CV 16-11613-RGS, 2021 WL 2582406, at *13 (D. Mass. June 23, 2021) ("Dr. Becker agreed that a patent could be worth more than the company that owns it"); *see also SSL Servs., LLC v. Citrix Sys., Inc.*, 940 F. Supp. 2d 480, 490 (E.D. Tex. Apr. 16, 2013) (valuation of patent holder and "the amount paid for the patents . . . did not limit the reasonable royalty"); *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1347 (Fed. Cir. 2011) (affirming "that the jury could reasonably have concluded that" the "pricing arrangement" for a patent holder's sale of its assets "had little relevance to a reasonable royalty"), *abrogated on other ground by Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).

In addition, the Chapter 11 Liquidation Analysis is based on a liquidation premise of value in the specific context of a bankruptcy liquidation "fire sale," which dissolves a company. *Alpex Comput. Corp. v. Nintendo Co.*, No. 86 CIV. 1749 (KMW), 1994 WL 681752, at *46 (S.D.N.Y. Dec. 5, 1994), *aff'd in part, rev'd in part*, 102 F.3d 1214 (Fed. Cir. 1996) (rejecting bankruptcy court disclosures of a patent at "firesale value" because they were (i) "made in an unrelated context

and under different assumptions", (ii) made within the context of a forced liquidation, when the plaintiff ultimately chose the "alternative course" of litigating claims, and (iii) "were made prior to any judicial finding that the patent was valid and infringed.").

Dr. Becker should have adjusted his calculations to account for these differences or declined to rely on these valuations for his analysis. Had he done so, the propriety of his discount would then be subject to cross-examination and debate. But he adopted the valuations *without any adjustment*, and so his opinion is not reliable, and the Court should exclude it.

### 3. The Valuations on Which Dr. Becker Relies Involve Materially Different Factual Circumstances Than Are Present in the Hypothetical Negotiation

The Federal Circuit has consistently found that the time infringement began is the date of the hypothetical negotiation, and there is no dispute that the hypothetical negotiation would have occurred on July 4, 2017. *See State Indus.*, 883 F.2d at 1580; *see also* Romain Decl. Ex. 1 ¶ 292. Adhering to "[t]he correct determination of [the hypothetical negotiation] date is essential for properly assessing damages." *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003). Where the input information used to calculate a reasonable royalty, such as prior license agreements, are too remote in time, those inputs will have "diminish[ed] relevance" and "extremely low" probative value with a risk of creating misunderstanding by the jury. *Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-00201-JRG, 2017 WL 1322550, at *4 (E.D. Tex. Apr. 6, 2017).

The valuations on which Becker relies are not comparable to the hypothetical negotiation because they took place *six years before* and *three years after* the hypothetical negotiations. In addition, the businesses of Peloton and Mad Dogg changed dramatically between 2011 (the date of the ███████████████) and 2017 (the date of the hypothetical negotiation) and, again,

between 2017 and 2020 (the date of the Sarchet Opinion and the Chapter 11 Liquidation Analysis). The ███████████████ estimates the value of Mad Dogg's equity as of May 31, 2011—***more than six years prior*** to the hypothetical negotiation. Mad Dogg's financial situation in 2011 was not the same as it was six years later at the date of the hypothetical negotiation. At the time of the ██████████████████ the Patents-in-Suit would not be issued for another six years and Peloton had not yet been founded. Because the Patents-in-Suit as well as Peloton and its infringing products did not exist at the time, the ████████████████ can provide little insight into a reasonable royalty for licensing the Patents-in-Suit. *See Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276–77 (Fed. Cir. 1999) (affirming district court's conclusion that two licenses entered into four and five years after the date of first infringement were "irrelevant for the hypothetical negotiation analysis" because of "the age of the license agreements, in the context of the changing technology and 'financial landscape' at issue").

Dr. Becker did not account for the material financial and economic differences between the market for the Patents-in-Suit at the time of the ████████████████ in 2011 and the market for the Patents-in-Suit as of the date of the July 4, 2017 hypothetical negotiation. In *Eidos Display, LLC v. Chi Mei Innolux Corp.*, this Court found that the probative value of a settlement agreement executed years after the hypothetical negotiation was "extremely low," while the risk of causing misunderstanding or misapplication by the jury was high. *Eidos Display*, 2017 WL 1322550, at \*4-5. Moreover, the patent had expired by the time of the settlement license. *Id.* On these bases, the Court excluded the settlement and the defendant's expert's reliance on it. *Id.* at \*5. ████████████████ was too remote in time and context from the hypothetical negotiation to be probative of a reasonable royalty rate without adjustment.

The Sarchet Opinion estimates Mad Dogg's value as a going concern in the midst of its

bankruptcy proceeding in 2020—***three years after*** the hypothetical negotiation. And the Chapter 11 Liquidation Analysis estimates the liquidation value of Mad Dogg in a 2020 bankruptcy fire sale. Dr. Becker ignores these wide gaps of time, implying that they do not matter. But the Sarchet Opinion and Chapter 11 Liquidation Analysis were prepared in 2020 during Mad Dogg's bankruptcy proceeding. The value of a distressed debtor's intellectual property assets, including patents, will be severely discounted due to challenges in enforcing intellectual property rights while in a precarious financial condition. Nevertheless, Dr. Becker fails to account for these material changes to Mad Dogg's business dealings, overall financial position, or the market for the Patents-in-Suit during this three-year time period. *See Odetics, Inc.*, 185 F.3d at 1276–77 (licenses executed years after the hypothetical negotiation date were irrelevant to reasonable royalty analysis because of the passage of time and the parties' changed economic circumstances).

Dr. Becker states further that because some patents in Mad Dogg's portfolio expired between the pre-infringement ████████████ (2011) and the post-infringement Sarchet Opinion (2020), the Sarchet Opinion's "lower implied value of the patent portfolio" constitutes the "maximum fair market value of the Patents-in-Suit as of the date of the hypothetical negotiation." Romain Decl. Ex. 1 ¶¶ 215, 216. But this conclusion wholly ignores the issuance of other Mad Dogg patents during this period, *including the Patents-in-Suit*. Dr. Becker's opinion improperly favors financial data from several years after the hypothetical negotiation, which, as stated earlier, was not reflective of the circumstances of the hypothetical negotiation, over information that would have been known to the parties at the time of the hypothetical negotiation. *See Syneron Med. Ltd. v. Invasix, Inc.*, No. 816CV00143DOCKES, 2018 WL 4696969, at *9 (C.D. Cal. Aug. 27, 2018) (post-infringement evidence "cannot be used to overturn the fundamental precept that requires an *ex ante* hypothetical negotiation between the patentee and infringer at a time before the

infringement began"); *see also Lucent Techs.*, 580 F.3d at 1325 (noting that the hypothetical negotiation tries to recreate the *ex ante* licensing negotiation scenario).

      **B.**    **Dr. Becker's Opinion Regarding The ███████ Settlement Fails to Account for the Absence of Assumption of Validity and Infringement and Differences in Peloton's Economic Circumstances**

      The hypothetical negotiation assumes validity and infringement, but Dr. Becker relies on the ███████ Settlement without considering that these remained disputed issues as of the ███████ Settlement. That settlement occurred early in the litigation process. Discovery was barely underway, and the Court had yet to receive briefing on the construction of various claims (let alone decide the matter). *See* Part II.B.2. *supra.* Accordingly, the issues of validity and infringement had not been determined, and the parties had little, if any, insight from the Court about how they would be determined.

      Likewise, at the time of settlement, ███ and Peloton had not reached agreement that validity and infringement had been established. *See* Part II.B.2. *supra*. Patent values are depressed where validity and infringement are disputed as compared to patent values in the hypothetical negotiation where such issues are presumed. But Dr. Becker's opinion does nothing to account for that difference. *See Flexuspine, Inc.*, 2016 WL 9276023, at *5 (striking Dr. Becker's opinion because, *inter alia*, he failed to establish that a settlement was reached "under sufficiently comparable circumstances to a hypothetical negotiation to aid the trier of fact in determining a reasonable royalty"); *see also Spreadsheet Automation Corp. v. Microsoft Corp.*, 587 F. Supp. 2d 794, 801 (E.D. Tex. 2007) (excluding *inter alia* "evidence of . . . licenses made under the threat of litigation"). His opinion is therefore unreliable.

      Dr. Becker also fails to account for how Peloton's rapidly changing economic circumstances impacted the ███████ Settlement. Even though Peloton would enter into the

hypothetical negotiation relatively close in time to the ███████ Settlement, it was not similarly situated for each transaction. As of the settlement date, Peloton had received a total of $119.7 million in financing.[3] Two days later, and about a month *before* the hypothetical negotiation, Peloton announced its receipt of $325 million in Series E financing.[4] In other words, Peloton nearly quadrupled the amount of financing it had received to date between the settlement and the hypothetical negotiation. The Series E financing changed Peloton's hypothetical negotiating position because the greatly increased capitalization allowed Peloton "to expand [its] product and content offerings [and] open new showrooms across the country." *Id.* (quoting Peloton Co-Founder and CEO, John Foley). Dr. Becker neglects to consider how Peloton's uncertain cash situation *prior* to the Series E financing affected the economic circumstances of its settlement with █████ *See Flexuspine, Inc.*, 2016 WL 9276023, at *5 (expert use of a settlement license without established it was entered into "under sufficiently comparable circumstances to a hypothetical negotiation" is unreliable). His failure in this regard renders his opinion unreliable and this Court should exclude it.

## V.   CONCLUSION

Because Dr. Becker relied on sources that are not comparable and made no adjustments to account for these differences, his opinions are unreliable and should be excluded.

---

[3]   *See* Craft, "Peloton funding rounds, valuation and investors," *available at* https://craft.co/peloton-interactive/funding-rounds (Last Accessed September 13, 2021).

[4]   *See, e.g.*, BusinessWire, Peloton Closes $325M Series E Financing, *available at* https://www.businesswire.com/news/home/20170524006107/en/Peloton-Closes-325M-Series-E-Financing (Last Accessed September 12, 2021).

September 14, 2021

CAPSHAW DERIEUX, LLP

*/s/  Elizabeth L. DeRieux*
Elizabeth L. DeRieux
Texas State Bar No. 05770585
114 East Commerce Avenue
Gladewater, Texas 75647
(903) 845-5770
Email:  ederieux@capshawlaw.com

*Attorneys for Plaintiff*
*Mad Dogg Athletics, Inc.*

OF COUNSEL:
David I. Gindler
Alex G. Romain
J. Samuel Payne
David C. Jonas
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067-3019
(424) 386-4000

Nathaniel T. Browand
MILBANK LLP
55 Hudson Yards
New York, NY 10001-2163
(212) 530-5096

Javier J. Ramos
Emily Glaser
MILBANK LLP
1850 K Street, NW
Suite 1100
Washington, DC 20006
(202) 835-7500

Paul L. Robinson
Law Office of Paul L. Robinson, Esq. LLC
500 Paterson Plank Road
Union City, NJ 07087
(954) 292-0945

## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that on September 14, 2021, counsel for Mad Dogg met and conferred by telephone with counsel for Peloton regarding the issues in this motion.  Counsel discussed the issues raised in the motion, but were unable to reach agreement. Accordingly, the motion is submitted as opposed.

*/s/ Elizabeth L. DeRieux*
Elizabeth L. DeRieux

## **CERTIFICATE OF SERVICE**

I certify that this document is being served on counsel of record by email on this September 14, 2021.

/s/  *Elizabeth L. DeRieux*

## CERTIFICATE OF AUTHORIZATION TO SEAL

I hereby certify that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this case.

/s/ *Elizabeth L. DeRieux*
Elizabeth L. DeRieux

19